[No. 13964.   Department One. — March 26, 1892.]

# CHARLES W. HILL, RESPONDENT, *v.* REBECCA Mc-KAY, APPELLANT.

CONSTRUCTION OF LOGGING CONTRACT — GRANT OF RIGHT OF WAY — LAND-ING "DOWN STREAM" — CHANGE OF LOCATION TO DIFFERENT STREAM — LIABILITY FOR PURCHASE OF LOGS.— The owner of timber adjacent to a slough, who also owned landings thereon for logging purposes, near the head of tide-water, granted to persons engaged in logging above his landings a right of way over his land for logging purposes, to a point below his landings, for a period of years, the grantees agreeing, in consideration thereof, to pay a certain sum annually, and that pro-vided they made landings and deposited their logs " down stream from the present landings " of the grantor, they would purchase yearly all logs hauled by him and deposited in the slough, paying therefor the pre-vailing market rates.   The grantees of the right of way constructed a logging railroad over it to a point on the same slough a short distance below the landings of the grantor, where they established a landing, and bought the logs of the grantor yearly during its continuance at that point.   They afterwards extended their logging railroad farther down stream, and constructed a new landing, located below the junction of the slough with another slough, it being disputed whether the latter slough had the same name as the former or a different name, and refused there-after to purchase logs from the grantor under the contract.   *Held,* that the grantees of the right of way were liable to the grantor for a failure to purchase his logs under the contract, without regard to whether the new landing was on the same or a different slough, there being nothing in the agreement to limit the words "down stream" to any particular slough.

ID. — CONFLICTING EVIDENCE AS TO EXTENT OF SLOUGH — INSTRUCTION TAKING QUESTION FROM JURY. — The evidence being conflicting as to whether the slough on which the grantor's landings were situated ex-tended down to and included the new landing of the grantees, and no instruction having been submitted to the jury as to the legal effect of a finding thereon, a requested instruction which assumed that the slough extended only to its junction with another and different slough, on which the new landing of the grantees was situated, was properly refused, as taking the question from the jury.

ID. — REFUSAL TO PURCHASE LOGS UNDER CONTRACT — SALES TO THIRD PARTIES — LIABILITY OF PURCHASER — TENDER. — When the grantees of the right of way under such contract refused to purchase the logs of the grantor deposited by him in the slough after the change of landings by the grantees, the grantor not only had the right, but it was his duty, to sell as many of them as he could for the highest price obtainable; and a sale of part of the logs after such refusal did not cancel the obligation of the grantees to purchase the remainder, which was deposited in the slough during the year; neither was a tender to the grantees necessary to be made of the logs deposited in the slough by the grantor after an

absolute refusal of the grantees to accept or purchase from the grantor any logs hauled by him or deposited in the slough.

ID. — OBLIGATION OF ASSIGNEE — COVENANTS BINDING ASSIGNS. — Where the logging contract included in the grant of the right of way provided that its covenants should bind the assigns of the respective parties, the obligation of the grantees, under the contract, to purchase the remaining logs of the grantor devolved upon the assignee of the grantees.

ID. — REFUSAL OF ASSIGNEE TO COMPLY WITH CONTRACT — ARBITRATION OF MARKET RATES — INSTRUCTION. — There being evidence tending to prove that the grantees' assignee unqualifiedly refused to be bound by or perform the contract, and to accept or purchase from the grantor the logs hauled and deposited by him in the slough, it was proper to instruct the jury that if they found such refusal from the evidence, it was not incumbent upon the grantor after such refusal to offer to determine by arbitration the prevailing market rates.

ID. — MARKET PRICE OF LOGS — MEASURE OF DAMAGES — INSTRUCTION. — Where the evidence tended to show that the market for logs nearest to the place in the slough where, by the contract, the grantor was to deliver and the grantees to accept the logs was at the mills in the vicinity of the city of Eureka, on Humboldt Bay, and that if there was any prevailing market price at the place where the logs were to be delivered, it was the same as the market price at the saw-mills on the bay, less the cost of transportation, an instruction to the jury that the measure of damages would be the difference, if any, between the sum which the logs hauled and deposited in the slough by the grantor during the year, and remaining therein, would have brought in the market on Humboldt Bay, at the prevailing rates during such year, and the value of the logs to the grantor as they lay in the slough, at the time of the grantees' refusal to accept them, if such refusal was made, is erroneous.

ID. — "PREVAILING MARKET RATES" — CONSTRUCTION OF CONTRACT — EXPENSES OF TRANSPORTATION. — Where there are no circumstances *dehors* the instrument to control the construction of the written terms, the clause in the agreement that the grantees should purchase all logs deposited in the slough, "paying therefor the prevailing market rates," means the prevailing market rates at the place and time of delivery, if ascertainable; but if not ascertainable, the market rates at the nearest market at the time of delivery, less the expense of transportation.

ID. — VALUE OF LOGS AT PLACE OF DELIVERY — REFUSAL TO PURCHASE — MEASURE OF DAMAGES AGAINST BUYER. — When there is no market at the place of delivery, the price of getting the logs to the nearest market is to be subtracted from the price at that market, to find the value at the place of delivery; and the measure of damages upon a refusal to purchase the logs contracted for is the market value of the logs at the nearest market at the time of delivery, less the expense of transportation.

ID. — NOMINAL DAMAGES. — Where it appears that the value of the logs to the seller at the place of delivery, and at such time after the breach by the buyer as would have sufficed to transport and resell them with reasonable diligence, was precisely equal to the amount due from the buyer under the contract, the seller is entitled to only nominal damages.

ID. — CONSTRUCTION OF CONTRACT IN VIEW OF ACTS OF PARTIES — INTENTION AS TO MARKET RATE — CONSIDERATION OF RIGHT OF WAY. — When

the meaning of the language of a contract is doubtful, the acts of the parties done under it afford one of the most reliable clews to the intention of the parties; and the practical construction given to the logging contract by the acts of the parties in fixing the market rate at the mill on Humboldt Bay, less the cost of transportation, more certainly indicates their intention than does a mere supposed inadequacy of a rental of three hundred dollars per year for the right of way, of which inadequacy there is no proof.

Id. — Obstruction of Slough — Excess of Expense of Transportation — Measure of Damages — Evidence. — Where the grantees of the right of way, by obstructing the slough below the grantor's landing, made the expense of rafting the grantor's logs to market much greater than it would have been if it were not for the obstructions, the grantor is entitled to recover as damages the excess of the expense of rafting his logs to market over and above what such expenses would have been if no obstructions had been placed in the slough by the grantees; but for the purpose of ascertaining such sum, it is necessary to prove the expense of rafting in an unobstructed condition of the slough, and also the expense of rafting in the obstructed condition so caused, and the difference is the true measure of damages.

Id. — Failure of Proof — Excessive Verdict. — Where the court has admitted evidence tending to prove the expense of rafting with the slough obstructed, but no evidence is offered as to the expense of rafting in an unobstructed state of the slough, a verdict in excess of the expense of the rafting in the obstructed condition of the slough will be set aside as excessive.

Appeal from a judgment of the Superior Court of Humboldt County.

The facts are stated in the opinion.

*Mastick, Belcher & Mastick*, for Appellant.

*J. D. H. Chamberlin*, for Respondent.

Vanclief, C. — At and before the time of the execution of the contract hereinafter set out, the plaintiff was the owner of timber-lands adjacent to and including a portion of Ryan's Slough, in the county of Humboldt. This slough is connected with Humboldt Bay, and is of sufficient size and depth to float rafts of saw-logs from plaintiff's lands. Near the head of tide-water in this slough, plaintiff had a landing, at which he dumped logs into the slough, and thence floated them to market on Humboldt Bay. During the same time Allan McKay, Alexander Connick, and John A. Sinclair, copart-

ners under the name of McKay & Co., were engaged in the business of logging on lands adjacent to Ryan's Slough, above the plaintiff's landing, and above tide-water, where the capacity of the slough was considerably less than at and below plaintiff's landing. Besides, at plaintiff's landing, the slough was often obstructed by his logs. McKay & Co. therefore desired to carry their logs by railroad to a point on the slough below plaintiff's landing, but in order to do this they must acquire the right of way for their road over plaintiff's land. Under these circumstances, the following agreement was executed:—

" Know all these men by these presents, that I, Charles W. Hill, of the county of Humboldt, state of California, party of the first part, for and in consideration of the sum of three hundred dollars, in gold coin of the United States, to me in hand paid by Allan McKay, of the city and county of San Francisco, and Alexander Connick, of said county of Humboldt, all in said state, parties of the second part, the receipt of which is hereby acknowledged, and for other good and valuable considerations, do hereby grant to said parties of the second part a right of way, two (2) rods in width, for logging and lumbering purposes, over and upon the southwest quarter of section number thirty (30), and the northwest quarter of section number thirty-one (31), in township number five (5) north, of range number one (1) east, of Humboldt meridian.

" Said way being more particularly described as beginning at the Freese dam on Ryan's Slough, at the intersection of the west bank thereof with the Humboldt meridian line, and running from thence north along or near said meridian line one half (½) miles, more or less, to its intersection of the west bank of said slough and Humboldt meridian line, said way to be at no point more than two hundred and sixteen (216) feet from said meander line.

"Together with the right to construct and maintain over such way all such roads, railroads, bridges, or other

structures for logging and lumbering purposes as such parties shall choose. All of which said rights shall continue and remain in full force and effect for the period of ten (10) years from the date hereof; and at the expiration of this instrument shall, at the option of said parties of the second part, be renewed in periods of ten (10) years each, not to exceed in all the full period of thirty (30) years from the date of these presents, subject always to the same terms and conditions.

"In consideration whereof, said parties of the second part agree to pay to said party of the first part, in gold coin, on the sixth day of April, A. D. 1884, the sum of three hundred dollars, and a like sum annually thereafter.

"That after the logging season of the year 1883, said parties of the second part will, providing they make landings and deposit their logs down stream from the present landings of said party of the first part, purchase yearly all logs hauled by said party of the first part and deposited in said slough, paying therefor the prevailing market rates.

"It is also agreed by and between the parties hereto, that providing they fail to agree upon said market rate, then it shall be determined by arbitration; that each of the parties hereto shall select one person to act as arbitrator, and if the two arbitrators fail to agree, they, the arbitrators, shall select a third person, and the decision of the arbitrators shall be final.

"The covenants herein contained are to bind the heirs, executors, administrators, and assigns of the respective parties.

"Time is hereby expressly declared to be of the essence of this contract.

"Executed in duplicate this sixth day of April, A. D. 1883, as witness our hands and seals.

"C. W. HILL.     [Seal.]

"ALLAN McKAY.     [Seal.]

"ALEX. CONNICK."     [Seal.]

It is admitted that McKay and Connick, in executing

this agreement, acted for the copartnership, and that the copartnership was bound by the agreement.

In 1883 McKay & Co. constructed their railroad to a point on the slough about 120 rods below the plaintiff's landing, where they established a landing at which they continued to dump their logs into the slough, until the latter part of 1887, and during all that period purchased plaintiff's logs according to the agreement.

During the year of 1887, McKay & Co. extended their railroad from this landing a distance of about 240 rods in a direct line across a bow in the slough, and terminating at a point on the slough about 385 rods (by way of the stream) below their dam used in connection with their upper landing, and there established a new landing, at which they have ever since dumped all their logs. Between their upper and lower landings there is a junction of Ryan's Slough with Freshwater Slough, and it was a disputed question at the trial, upon which the evidence was conflicting, whether the name of the slough below this junction is *Ryan's* Slough or *Freshwater* Slough.

On September 12, 1888, the defendant acquired all the copartnership property of McKay & Co., including the agreement above set out, and it is admitted that she is bound by that agreement as McKay & Co. were bound by it before it was assigned to her. The object of this action is to recover from defendant damages for an alleged breach of that agreement by her in the year 1888.

The complaint alleges that during the year 1888 the plaintiff cut, hauled, and put into said slough, below his landing, 1,240 saw-logs containing 1,078,232 feet of merchantable lumber, of the value of $10,782.32, which, on the twelfth day of September, 1888, and many times thereafter during the year 1888, he tendered to the defendant and demanded that she purchase the same, in accordance with the terms of said agreement, which she " absolutely and unqualifiedly refused to do, and she still does absolutely and unqualifiedly refuse to purchase the same at any price or upon any terms or conditions;

that plaintiff has ever since been and is now unable to sell the said saw-logs; and plaintiff avers that by the said breach of said agreement in not purchasing his said saw-logs he has been and is damaged in the sum of $10,782.32."

The answer denies the alleged tender of the logs; denies that 1,240 logs were all the logs hauled by plaintiff and deposited in Ryan's Slough during the year 1888; denies the alleged value of the logs; denies that McKay & Co. or defendant, during the year 1888, deposited any logs in Ryan's Slough "down stream from" plaintiff's landing; alleges that, without the consent of defendant, plaintiff sold to other persons 542 of the logs hauled and deposited in the slough by him during the year 1888; and denies all damages.

The case was tried by a jury. Verdict and judgment in favor of plaintiff for the sum of $1,590.80, from which defendant brings this appeal on the judgment roll, containing a bill of exceptions which raises questions of both law and fact.

1. Appellant's counsel contend that defendant's lower landing, where she and her predecessors deposited all their logs during the year 1888, was not upon Ryan's Slough, but was upon Freshwater Slough, and that the contract bound them to purchase plaintiff's logs only while they deposited logs in Ryan's Slough below plaintiff's landing; and upon this point they requested the following instruction to the jury, which the court refused: " I charge you, that if you find from the evidence that all the logs that were deposited by McKay & Co. or by defendant, during the year 1888, were deposited from landings maintained and used by them on the stream formed by the junction of Ryan's Slough with Freshwater Slough, and below said junction, then I instruct you that defendant is not liable under said contract set forth in said amended complaint, and your verdict must be for the defendant."

Considering the admitted circumstances under which the agreement was made, and the conflicting evidence

as to the extent of Ryan's Slough below the junction of the two sloughs, I think the court did not err in refusing the requested instruction.

The object of McKay & Co. in procuring the agreement was to enable them to make their landings on tide-water below plaintiff's landing, where the slough was of greater capacity, and would not be obstructed by plaintiff's dam and logs. The agreement on their part to purchase plaintiff's logs during the term of the lease, at the prevailing market rates, "providing they make landings, and deposit their logs down stream from the present landings" of plaintiff, was evidently intended to compensate plaintiff for the advantage he gave them in the change of the relative positions of their respective landings, whereby they were permitted to obstruct the navigation of the slough below his landing by their dam and logs. By their agreement to purchase his logs at market rates, he was relieved from rafting his logs, and therefore their obstructions below his landing did not affect his interests. Besides, the agreement does not fix any points below plaintiff's landing at which McKay & Co. were to establish their landings. They might have established a landing at the point of their present lower landing in the first instance by constructing 240 rods of additional railroad. The language of the agreement is, "down stream from the present landings of said party of the first part"; not down stream *upon Ryan's Slough*. Ryan's Slough is not mentioned in that part of the agreement relating to the purchase of plaintiff's logs. Nor is there anything elsewhere in the agreement limiting the words "down stream" to Ryan's Slough, while the circumstances under which the agreement was made plainly indicate that no such limitation was intended.

On the theory of defendant's counsel, the question as to whether or not Ryan's Slough extends down to and includes defendant's lower landing is a material question of fact. As such, it was tacitly submitted to the jury on conflicting evidence, without any instruction as to the legal effect of a finding upon it, none having been

requested, except the one under consideration, and another to the same effect, by defendant's counsel; yet the requested instruction assumed that Ryan's Slough extends only to its junction with Freshwater, and thereby took from the jury the question as to whether it does so or not. Therefore, whether the question was material or not, the requested instruction was erroneous, although, as above indicated, I think the question was immaterial; and had an instruction been asked to this effect, judging from the opinion of the court on defendant's motion for nonsuit, it probably would have been given.

2. It is contended for appellant that the defendant was not bound to purchase less than all the logs hauled by plaintiff and deposited in the slough in any one year, and that plaintiff did not tender to defendant all the logs hauled and deposited in the slough in the year 1888, but sold a considerable portion of them to other parties.

The evidence on the part of the plaintiff tended to prove that all the logs hauled or deposited in the slough by plaintiff during the year 1888 had been tendered by him either to McKay & Co. before September 12th, or to defendant on and after September 12th, of that year, and that he had sold no logs to other parties until after they had been so tendered, and after McKay & Co. or defendant had absolutely refused to accept or purchase such logs, or any part thereof, upon any terms whatever, claiming that they were not bound by the agreement to purchase any logs from plaintiff during 1888, because during that year they had deposited no logs in *Ryan's Slough*, down stream from plaintiff's landing.

Under this state of the evidence, counsel for the defendant requested two instructions to the jury, which the court refused to give as requested, but gave with modifying additions as follows, the additions being Italicized:—

" 11. I charge you, that if you find from the evidence that the plaintiff did not tender to defendant or offer to sell to her all the logs hauled by him and deposited in Ryan's Slough during the year 1888, then your verdict

must be for the defendant; *unless you further find from the evidence that defendant or McKay & Co. absolutely refused to accept or purchase from plaintiff any logs hauled and deposited by him in Ryan's Slough during the year 1888, in which case a tender of said logs by plaintiff would not have been necessary.*

"12. I charge you, that if you find from the evidence that the plaintiff, before making the tender to defendant alleged in the complaint, had sold to persons other than defendant or McKay & Co. a portion of the logs hauled by him and deposited in Ryan's Slough during the year 1888, then your verdict must be for the defendant. *But if you find from the evidence that, before making such sales, plaintiff tendered to defendant all the logs deposited by him in Ryan's Slough at that time, during that year, and that the defendant or McKay & Co. absolutely refused to accept or purchase from plaintiff, under said contract, any logs during said year, and that, in making such sales, plaintiff was acting upon such refusal, then, in that case, he could recover in this action.*"

The court, of its own motion, further instructed the jury on this point as follows:—

"If you find from the evidence that plaintiff sold a portion of the logs hauled and deposited by him in Ryan's Slough during the year 1888 to other parties than the defendant or McKay & Co., but that no logs were sold by him during said year until after he had tendered all of his logs to defendant or McKay & Co., or until after defendant or McKay & Co. had unequivocally refused to accept from plaintiff his logs under said contract during said year, and that in making such sales to other parties the defendant was acting upon such refusal, then in such case the plaintiff would be entitled to recover whatever damages he may have suffered, if any, by the refusal of defendant to accept and pay for the logs deposited by plaintiff in Ryan's Slough during the year 1888, and remaining therein at the time this action was brought."

Appellant's counsel contend that the court erred in

refusing the first two of these instructions as requested, and in giving them as modified, and also in giving the third.

In the first place, it is urged that these instructions are erroneous, so far as they "laid down the rule that plaintiff could recover without proof of a tender." But I do not understand them as laying down such a rule.

In the second place, it is said that they are erroneous "in so far as they charged that a prior refusal *by Mc-Kay & Co.* would, in any event, entitle plaintiff to recover without proof of a tender *to defendant."* They do not so charge. Nor does the plaintiff, by his complaint or otherwise, seek to recover for any breach of the contract by McKay & Co., before the assignment of the agreement to defendant. The evidence offered by plaintiff tending to prove a tender to McKay & Co. prior to September 12, 1888, and their refusal to purchase, could have had no other effect in this case than to excuse plaintiff's sale of a portion of the logs hauled in 1888, after they refused to purchase. The defendant is not sued for or on account of any logs sold by plaintiff before she became the assignee of the agreement and the owner of all the partnership property, but only for not purchasing a specified number of logs which were alleged to be on hand and in the slough at the times they were tendered to her on and after September 12, 1888.

The third of the instructions under consideration limits the damages to such as resulted from defendant's refusal to purchase "the logs deposited by plaintiff in Ryan's Slough during the year 1888, *and remaining therein at the time this action was brought."* After McKay & Co. refused to purchase, it was not only the privilege of the plaintiff, but his duty, to sell as many of his logs as he could for the highest obtainable price; and had he succeeded in selling all for a price equal to that which McKay & Co. agreed to pay, he could have recovered from them no more than nominal damages. (*Utter* v. *Chapman,* 38 Cal. 659; *Winans* v. *Sierra L. Co.,* 66 Cal. 61.) But however this may be, no question as to

the logs sold by plaintiff is involved in this case, except the question as to whether McKay & Co. unqualifiedly refused to purchase them after tender by the plaintiff. The refusal of McKay & Co. to purchase, and the sale of a part of the logs thereafter by plaintiff, did not cancel their obligation to purchase the remainder during the year 1888 (Sedgwick on Damages, sec. 754); and their obligation to purchase the remainder during the year 1888 devolved upon the defendant by the express terms of the lease, viz.: " The covenants herein contained are to bind the . . . . assigns of the respective parties."

3. Defendant's counsel requested an instruction applicable to the arbitration paragraph of the agreement, which, as requested, the court refused, but gave with an addition as follows, the addition being in Italics: —

" I charge you, that if it appears from the evidence that plaintiff and defendant failed to agree upon the market rate for said logs, and if the evidence fails to show that plaintiff demanded that such rate should be determined by arbitration, then your verdict must be for the defendant; *unless you further find from the evidence that the defendant absolutely and unqualifiedly refused to be bound by said contract, and to accept or purchase from plaintiff the logs hauled and deposited by him in Ryan's Slough during the year 1888, in which case it was not incumbent upon plaintiff, after such refusal of performance on the part of the defendant, if such refusal was made, to offer to determine by arbitration the prevailing market rate.*"

The only objection urged to the addition made by the court is, that there was no evidence tending to prove the facts therein hypothetically stated. But in this I think counsel are mistaken.

4. Appellant contends that the court did not properly instruct the jury as to the measure of damages, and consequently, that the damages are excessive. I think this point should be sustained.

The evidence tended to show that the market for logs nearest to the place in Ryan's Slough, where, by the contract, plaintiff was to deliver and defendant to accept the

logs in question, was at the mills in the vicinity of the city of Eureka, on Humboldt Bay, and that if there was any prevailing market price at the place where the logs were to be delivered, it was the same as the market price at the saw-mills on the bay, less the costs of transportation.

The court, of its own motion, instructed the jury as follows: "If you find for the plaintiff upon the issues submitted to you, then you will have to estimate the amount of damages; and I charge you, that the measure of damages in this case is the difference, if any, between the sum which the logs hauled and deposited in Ryan's Slough by plaintiff during the year 1888, and remaining therein at the commencement of this action, would have brought in the market here, on Humboldt Bay, at the prevailing rates during the year 1888, and the value of said logs to the plaintiff as they lay in the slough at the time of defendant's refusal to accept them, if such refusal was made."

As contended by counsel for appellant, I think this instruction is based upon a misconstruction of the agreement as to the price to be paid for the logs in case there was no market price at Ryan's Slough, where the logs were to be delivered, in that the instruction allows nothing to be deducted from the market value at Humboldt Bay— the nearest market— on account of expenses of transportation.

Section 3311 of the Civil Code, so far as applicable to this case, is as follows: —

"Sec. 3311. The detriment caused by the breach of a buyer's agreement to accept and pay for personal property, the title to which is not vested in him, is deemed to be: . . . . 2. If the property has not been resold in the manner prescribed by section 3049, the excess, if any, of the amount due from the buyer, under the contract, over the value to the seller, together with the excess, if any, of the expenses properly incurred in carrying the property to market, over those which would have

been incurred for the carriage thereof, if the buyer had accepted it."

The agreement does not directly or conclusively fix the price to be annually paid, but provides that defendant shall purchase all logs deposited in the slough, " paying therefor the prevailing market rates." Unless controlled by circumstances *dehors* the agreement as written, this means the prevailing market rates at the place and times of delivery, if that can be ascertained; but if no market rate at such place and times can be ascertained, it means the market rates at the nearest market at the times of delivery, less the expenses of transportation (Sedgwick on Damages, 8th ed., secs. 738, 739); this being the rule in case of a breach of the agreement by the buyer, when the title has not passed. In such case, " when there is no market at the place of delivery, the price of getting the goods to the nearest market is to be subtracted from the price at that market, in order to find the value at the place of delivery." (Sedgwick on Damages, sec. 753.) By this rule, the value of the logs to plaintiff (the seller) at the place of delivery was the market value at Humboldt Bay, less costs of transportation, " at such time after the breach of the contract as would have sufficed, with reasonable diligence, for the seller to effect a resale" (Civ. Code, sec. 3353); that is, at such time after the breach as would have sufficed to transport the logs to Humboldt Bay, and resell them at the market rate there.

From the foregoing consideration it seems necessarily to follow, that the value of the logs to plaintiff at the place of delivery, and at such time after the breach as would have sufficed to transport and resell them, was precisely equal to " the amount due from the buyer " (defendant) according to the agreement; and therefore that the plaintiff was entitled to only nominal damages. (Sedgwick on Damages, sec. 753.)

Were there any circumstances *dehors* the written agreement which would warrant a construction of the agreement different from that above given?

The only claim that the evidence tended to prove any such circumstance is to be found in the opinion of the court upon denying defendant's motion for a nonsuit; in which, as to this, the court said: "Now, the view I take of it is, that, under that contract, *considering the advantages which the plaintiff had yielded to them* (McKay & Co.), they were willing to take his logs there as he deposited them in Ryan's Slough, and pay him whatever was the prevailing market rate for saw-logs in the vicinity of Humboldt Bay during the year that the deposit was made."

This assumes, without evidence, that the payment of the annual rent of three hundred dollars, and the purchase of plaintiff's logs by McKay & Co. at their market value in the nearest market, less the cost of transportation, would not fully compensate plaintiff for the advantages which he "had yielded to them." There is not a particle of evidence tending to prove that three hundred dollars per year for the right of way for defendant's road was not full compensation for the grant of that right. The only other advantage that plaintiff yielded to McKay & Co. was the privilege of establishing their landings, and dumping their logs into the slough below his landing, and thus, to some extent, obstructing the rafting of his logs. For this, was not the purchase of all his logs at this landing at a price equal to the market value in the nearest market, less the cost of transportation to such market, adequate compensation? He was thereby relieved from rafting his logs to market, yet realized from the sale of them at his landing precisely what he would have realized if he had never yielded to McKay & Co. any advantage whatever. This certainly was full compensation for all advantages yielded by him; and there is no evidence that both parties to the agreement did not so consider and intend.

There was evidence on behalf of the defendant, however, which, if the agreement is in any degree ambiguous or uncertain, strongly tends to confirm the construction

for which the appellant contends, by showing the action of the parties under the agreement during the five years preceding the year 1888.

Alexander Connick, one of the parties to the agreement, testified that during that period "the price of the logs in each year was arrived at and regulated by the price of lumber in the market. We based the price upon the market rates here at the mill,—delivered at the mill on Humboldt Bay. We paid him that market rate, less the cost of transportation,—the rafting them out. That was the market rate of his logs as they lay in the slough below his dam. . . . . In fixing these rates, the cost of transportation was discussed between McKay & Co. and the plaintiff." This testimony was undisputed. When the meaning of the language of a contract is considered doubtful, the acts of the parties done under it afford one of the most reliable clews to the intention of the parties. (*Mulford* v. *Le Franc*, 26 Cal. 108; *Pio Pico* v. *Coleman*, 47 Cal. 65; *Truett* v. *Adams*, 66 Cal. 218.) Therefore, conceding that the agreement is ambiguous or uncertain as to the price to be paid for the logs, this practical construction of it by the acts of the parties more certainly indicates their intention than does the supposed inadequacy of compensation for advantages yielded by plaintiff, adverted to by the court.

5. It is contended for respondent, however, that the defendant and her assignors have so obstructed the slough below his landing as to make the expense of rafting his logs to market much greater than it was before they made their landings below his, and much greater than it would be now but for such obstructions; and against the objection of defendant's counsel, was permitted by the court to introduce evidence tending to prove this. The ground of the objection to this evidence was, that it was irrelevant to any issue in the case. As to the effect of this evidence, the court instructed the jury as follows: "The testimony in relation to the condition of the slough, and as to whether obstructions have existed

therein or not, and if so, to what extent, was admitted solely for the purpose of informing you as to whether said logs could have been taken to the bay or to market, and if so, with what facility, and at what expense, and in that connection to be considered by you, with the other evidence, in estimating the value of the logs to the plaintiff as they lay in the slough in the fall of 1888."

Thus limited, I think the evidence was not irrelevant. The plaintiff was entitled to recover as damages the excess of the expenses of rafting his logs to market, over and above what such expenses would have been if no obstructions had been placed in the slough by defendant or her assigns. In other words, he is entitled to recover a sum equal to the additional expense of rafting his logs to market, caused by the obstructions which have been placed in the slough by defendant or her assignors. For the purpose of ascertaining this sum, it would be necessary to prove the expense of rafting in an unobstructed condition of the slough, and also the expense of rafting in the obstructed condition caused by defendant or her predecessors. The difference would be the true measure of damages. But there was no evidence of what would have been the expense of rafting in an unobstructed state of the slough, and consequently no evidence of any difference. The plaintiff introduced no evidence of the expense of rafting in any condition of the slough; and of the nine witnesses who testified on behalf of defendant as to such expense in the actual condition of the slough during 1888 and since, one estimated it at forty-five cents per thousand feet, five at fifty cents, one at sixty cents, and two at seventy-five cents. At seventy-five cents per thousand feet, the transportation of the 1,078,232 feet, alleged to have been tendered to defendant, would have cost $808.67; yet the verdict is $1,590.80. It therefore appears that the damages are excessive.

I think the judgment should be reversed, and a new trial granted.

FITZGERALD, C., and FOOTE, C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment. is reversed, and a new trial granted.

Hearing in Bank denied.